UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

HAROLD LEE,                          :
        Plaintiff,               :           No. 4:CV-03-1026
                              :
    v.                             :
                              :           (Judge Jones)
JEFFREY BEARD, et al.,               :
        Defendants              :

## MEMORANDUM

March 18 , 2008

**THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:**

## I.    Procedural History

Plaintiff Harold Lee ("Lee"), an inmate currently confined in the Mahanoy State Correctional Facility, Frackville, Pennsylvania, ("SCI-Mahanoy"), filed this pro se civil rights action pursuant to 42 U.S.C. § 1983 on June 20, 2003.  He complains of inadequate medical treatment he received while housed at SCI-Mahanoy as well as in his former place of confinement, SCI-Coal Township.  Specifically, Lee alleges a lack of treatment and improper treatment for tuberculosis, hepatitis C and sleep apnea.  Along with his complaint, Lee filed an application to proceed in forma pauperis.  (Doc. 2.)

Named as Defendants in the complaint are Jeffrey Beard, Secretary, Department of Corrections; Frank Gillis, Superintendent, SCI-Coal Township; Kandis Dascani,

Assistant Superintendent, SCI-Coal Township; Judy Rodichok, Medical Director, SCI-Coal Township; Wilma Sewell, Correctional Health Care Administrator, SCI-Coal Township; Bradley Loch, SCI-Coal Township; Dr. Kort, SCI-Coal Township; Marva Cerullo, Medical Department Administrator, SCI-Mahanoy; Edgar M. Kneiss, Deputy Superintendent, SCI-Mahanoy; and Edward J. Klemm, Superintendent, SCI-Mahanoy. On June 30, 2003, Lee filed a motion for leave to file an amended complaint, (Doc. 5) in which he sought to name Betty Sue Pugla, Infectious Control Nurse, SCI-Mahanoy and Dr. Edelman, Medical Department, SCI-Mahanoy as additional Defendants.

By Order dated July 10, 2003, the Court granted Lee's motion to proceed in forma pauperis, and his motion to amend to name two additional Defendants. (Doc. 6.) The Court also dismissed Lee's claims pursuant to 28 U.S.C. § 1915(e): the claims against Beard, Gillis, Dascani, Rodichok, Sewell, Loch, Cerullo, Kneiss, Klemm, and Pugla were dismissed without prejudice as frivolous pursuant to 28 U.S.C. § 1915(e)(2)(b)(i); the complaint was dismissed against Dr. Kort, Dr. Edelman, and Head Nurse Alice Chipriano for failure to state a claim upon which relief may be granted, pursuant to 28 U.S.C. § 1915(e)(2)(b)(ii); and Lee was granted leave to amend within twenty (20) days of the date of the Court's Order. (Doc. 6.) Lee was warned that failure to file such amendment would result in the dismissal of his action. Id.

By Order dated August 11, 2003, Lee's complaint was dismissed for failure to timely comply with the Court's order to file an amended complaint. (Doc. 10.) Subsequently, on August 29, 2003 and September 15, 2003, Lee filed motions for reconsideration of this Court's August 11, 2003 Order dismissing his case. (Docs. 11, 12.) By Order dated February 11, 2004, Lee's motions for reconsideration were granted, and Lee was granted leave to file an amend complaint within twenty (20) days of the date of the Order. (Doc. 14.)

After being granted two enlargements of time (Docs. 16, 18), Lee filed his amended complaint on May 6, 2004. (Doc. 20.) The amended complaint names as defendants Wilma Sewell, Correctional Health Care Administrator, SCI-Coal Township; Judy Rodichok, Medical Director, SCI-Coal Township; Dr. Kort, SCI-Coal Township; Marva Cerullo, Medical Department Administrator; Dr. Edelman, Medical Department, SCI-Mahanoy; and Nurse Betty Sue Pugla, Infectious Control Nurse, SCI-Mahanoy.

On August 10, 2004, defendants Joseph Kort, M.D., Adam Edelman, M.D. and Judith Rodichok filed a motion to dismiss Lee's amended complaint. (Doc. 26.) By Order dated February 10, 2005, Lee's amended complaint was dismissed as barred by the statute of limitations, with respect to Defendants Kort and Rodichok, and for failing to state a claim against Defendant Edelman. (Doc. 38.) Although Defendants Sewell,

3

Cerullo and Pugla did not join in the moving Defendants' motion to dismiss, the Court found that dismissal of these Defendants was appropriate pursuant to 28 U.S.C. § 1915(e)(2)(B)(i), which permits a court, at any time, to dismiss an action if it determines that the action is frivolous, malicious, or fails to state a claim.  Id.

On February 25, 2005, Lee filed a Notice of Appeal with the United States Court of Appeals for the Third Circuit.  (Doc. 42.)  On December 23, 2005, the Court of Appeals affirmed the dismissal of Defendants Kort, Rodichok and Sewell, and reversed the dismissal of Defendants Edelman, Cerullo and Pugla finding that:

> It may be that Edelman's decision to postpone treatment for a year was based on a medical judgment, but taking the allegations of the complaint to be true, it may be it was based on deliberate indifference. Similarly, Nurse Pugla told him he needed to wait four months for a new protocol. It is not clear from the record that her actions were based on medical judgment.

> As to the claims against Cerullo, Lee alleges in his amended complaint that he submitted grievances and complaints to Cerullo, and that she ignored them. Thus, it appears that Lee's allegations against Cerullo are based on her direct actions or inaction, rather than on respondeat superior.

(Doc. 57 at 5-6.)  Thus, the Court of Appeals held that for purposes of a motion to dismiss, Lee's allegations were sufficient to state a claim of deliberate indifference.  Id.

Presently before the Court are motions for summary judgment filed on behalf of Defendants Cerullo and Pugla, and Dr. Edelman.  (Docs. 79, 87.)  The motions have been

4

fully briefed by the parties and are ripe for disposition.  For the following the reasons, the motions will be granted.

## II.   Standard of Review

Federal Rule of Civil Procedure 56(c) requires the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c.)  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original.)

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law.  Anderson, 477 U.S. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992.)  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson, 477 U.S. at 257; Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am., 927 F.2d 1283, 1287-88 (3d Cir. 1991.)

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party.  Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consol. Rail Corp., 963 F.2d 599, 600 (3d Cir. 1992); White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988.)  In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings.  When the party seeking summary judgment satisfies its burden under Rule 56(c) of identifying evidence which demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56(e) to go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986.)  The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986.)  When Rule 56(e) shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all

other facts immaterial." <u>Celotex</u>, 477 U.S. at 323; <u>see also</u> <u>Harter v. G.A.F. Corp.</u>, 967 F.2d 846, 851 (3d Cir. 1992).

**III.   Statement of Facts**

Lee contracted hepatitis C[1] approximately eighteen years ago while incarcerated in the Bucks County Correctional Facility. (Doc. 99, Pl.'s Statement of Facts.) In 1997, a physician at a Veterans Administration hospital ordered interferon treatments for Lee; however, Lee was incarcerated the next day, on September 22, 1997, in a county prison that was not equipped to treat his hepatitis C. (Doc. 20, Amended Complaint at ¶¶ 1-3.)

In 1998, Lee was transferred to SCI-Coal Township, where he "refused treatment at that time." (Doc. 99 ¶ 5.) In 2001, hepatitis C treatment was ordered by Dr. McLaughlin. (Doc. 20 ¶ 6.) However, a month after treatment was ordered, Lee was transferred to SCI-Mahanoy. <u>Id</u>.

On July 5, 2001, Lee arrived at SCI-Mahanoy. (Doc. 89, Ex. D, Progress Notes.) Upon his arrival, he was screened by the nursing staff. <u>Id</u>. During his screening, it was

---

1.   Hepatitis C is one of six identified hepatitis viruses — the others are A, B, D, E and G. All cause the liver to become inflamed, which interferes with its ability to function. Hepatitis C is generally considered to be among the most serious of these viruses. Over time, a hepatitis C infection, can lead to liver cancer, liver failure or cirrhosis, an irreversible and potentially fatal scarring of the liver. <u>See</u> *Hepatitis C*, at http://www.mayoclinic.com/health/hepatitis-c/DS00097.

noted that Lee, a 47 year-old male, had a history of hepatitis C antibody and that he last underwent treatment with interferon in 1998. Id. He had been seen by a doctor on June 5, 2001, who had ordered a hepatitis C treatment evaluation. Id. Lee's last hepatitis C RNA PCR Viral Load Quantitative Testing revealed a viral load of greater than 1,000,000. Id. It was recommended that Lee be referred to the Infectious Control Nurse for a hepatitis C treatment evaluation. Id. Lee's intake screening also noted that on May 29, 2001 and May 30, 2001 Lee had undergone an infirmary observation for complaints of snoring and inability to sleep. Id. There were no noted instructions for treatment as a result of the sleep study. Id. Nor is there any further complaint of sleep problems noted in Lee's medical record from July 5, 2001 through October 3, 2002. Id.

On July 24, 2001, Lee was seen in the hepatitis C clinic by Dr. Edelman. Id. Dr. Edelman spoke with Lee about hepatitis C, possible treatment plans, and the need for a hepatitis A vaccine. Id. At that time, Lee stated that he would "think about treatment options." Id.

As of July 2001, the Pennsylvania Department of Corrections was in the early stages of the implementation of a new hepatitis C treatment protocol which was designed to "phase in" the start of treatment for the state prison system's thousands of hepatitis C positive inmates. (Doc. 89, Ex. H, Affidavit of Adam Edelman, M.D., ¶ 10.) The new

8

hepatitis C treatment protocol would administer a relatively new medication, known as pegylated interferon.[2]  Id. at ¶ 11.  In addition to an overall favorable response by patients in general, pegylated interferon was especially successful in the treatment of patients, such as Lee, who are over the age of 40, have a long history of hepatitis C, and a high viral load.  Id. at ¶¶ 12, 13.

In Dr. Edelman's professional medical opinion, the use of pegylated interferon was the most medically appropriate choice, and was a superior choice medically to the use of non-pegylated interferon.  Id. at ¶ 14.  Lee admits that Dr. Edelman told him that he believed that the pegylated interferon was a better treatment choice, and that it had a better chance of getting a good result.  (Doc. 89, Ex. I, Lee Deposition at 12-13, 32.)  Lee does not dispute that Dr. Edelman believed that the pegylated interferon was the better treatment choice.  Id. at 45.

Dr. Edelman next met with Lee on September 4, 2001, in the hepatitis C clinic, at which time they again discussed treatment options.  (Doc. 89, Progress Notes.)  At that time, Lee agreed to await the availability of pegylated interferon, which was expected to

---

2.    The standard of care for hepatitis C treatment is weekly injections of a drug called pegylated interferon alpha combined with twice-daily oral doses of ribavirin (Rebetol) — a broad-spectrum antiviral agent. Two pegylated interferon medications are available, peginterferon alfa-2b (Peg-Intron) and peginterferon alfa-2a (Pegasys.) The goal of HCV treatment is to clear the virus from the bloodstream. Combined pegylated interferon and ribavirin clear HCV infection in 40 to 80 percent of those treated. See Hepatitis C, at http://www.mayoclinic.com/health/hepatitis-c/DS00097/DSECTION=8.

become available under the protocol in the early spring of 2002.  (Doc. 89, Ex. D, Progress Notes; Ex. H at ¶ 15.)

Lee was next seen in the hepatitis C clinic by Dr. Edelman on January 8, 2002. (Doc. 89, Ex. D, Progress Notes.)  At that time, the new pegylated interferon had not yet become available, and Lee was no longer willing to await its arrival.  (Doc. 89, Ex. H at ¶ 16.)  Because of Lee's insistence, and despite Dr. Edelman's opinion that it would be the better choice to await the new pegylated interferon, Dr. Edelman granted Lee's request to order the start of a course of treatment based upon the older, non-pegylated interferon.  Id. At that time, Dr. Edelman referred Lee to psychiatry for the required evaluation[3] prior to undergoing interferon treatment for hepatitis C.  (Doc. 89, Ex. D, Progress Notes.)

On February 6, 2002, Lee was seen and psychiatrically cleared for treatment by Dr. Ahner.  (Doc. 89, Ex. F, Consultation Record.)

On February 20, 2002, Lee was seen by Dr. Edelman in the hepatitis C Clinic. (Doc. 89, Ex. D, Progress Notes.)  Dr. Edelman noted Lee's successful completion of the psychiatric examination, and referred him for the administration of the Beck Depression Index.  Id.

---

3.    The use of interferon (pegylated or non-pegylated) has potential side effects when utilized on patients who are depressed or suicidal, and therefore the treatment protocol requires the administration of a psychiatric examination and a "Beck Depression Index" before any treatment may begin.  (Doc. 89, Ex. D at ¶ 17.)

On February 25, 2002, after Lee's Beck Depression Index was successfully completed, Dr. Edelman wrote the orders for the commencement of Lee's treatment, which included a six-month course of the older, non-pegylated interferon, to be administered three times per week by injection; with Ribavirin orally twice a day; and the required blood testing during this time period.  (Doc. 89, Ex. E, Physician's Orders.)

On March 1, 2002, Lee was seen by the Nurse Pugla, who counseled him on the treatment process and protocol, on the possible side effects from the medication, and the need for monthly psychiatric follow-up and administration of the Beck test.  (Doc. 89, Ex. D, Progress Notes.)

On March 24, 2002, Lee was seen by Dr. Edelman in the hepatitis C clinic.  Id.  Dr. Edelman recommended continuing the current treatment, noting that "[patient] feels fine, no complaints."  Id.

Lee was again seen in the hepatitis C clinic on April 24, 2002, by a physician's assistant, as a follow-up for his treatment.  Id.  It was noted that Lee had no complaints, felt good and was not suffering from any side effects from the treatment.  Id.

On May 21, 2002, Lee was seen in the hepatitis C clinic by Dr. Ciaglia.  Id.  Lee complained of pain in his left scapula region and down his left arm.  Id.  Dr. Ciaglia determined it to be muscle pain, a known side effect of interferon treatment.  Id.  Dr.

Ciaglia "strongly and firmly advised [Lee] to stop Hep C treatment." Id. Lee, however, was "adamant about continuing for 1 more month." Id. Treatment was ordered continued with Lee's understanding that he may continue to experience side effects. Id. Lee was also instructed to return to the medical department if the symptoms worsened. Id.

Lee was next seen in the hepatitis C clinic by Dr. Edelman on June 7, 2002. Id. At this time, Lee had been on the requested hepatitis C treatment for three months. Id. Lee reported that he was feeling "fine" and "okay". Id. Dr. Edelman ordered Lee's treatment to continue. Id.

On June 25, 2002, Lee's annual tuberculosis ("TB") test was ordered. (Doc. 89, Ex. E, Physician's Orders.) On July 10, 2002, Lee tested positive for TB infection.[4] (Doc. 89, Ex. D, Progress Notes.) At that time, Lee did not display any fever, cough, chills, or night sweats and his lungs sounded clear. Id. Because Lee was on Ribavirin for the treatment of hepatitis C, it was determined that any treatment for TB would be

---

4 .   Tuberculosis is an infection that primarily affects the lungs. Although the body may harbor the TB bacteria, the immune system often can prevent a person from becoming sick. For that reason, doctors make a distinction between TB infection and active TB. TB infection causes no symptoms and is not contagious. Active TB causes illness and can spread to others. However, the infection may be asymptomatic for years, even though it is active. The body's immune system begins to attack TB bacteria two to eight weeks after infection. Sometimes the TB bacteria die, and the infection clears completely. In other cases, the bacteria remain in the body in an inactive state and cause no symptoms. In still other cases, active TB may develop. See *Tuberculosis* at http://www.mayoclinic.com/health/tuberculosis/DS00372/DSECTION=2.

withheld until after Lee's course of treatment for hepatitis C was completed. <u>Id</u>. It was noted that Lee was to be tested again for TB in October 2002. <u>Id</u>.

On July 19, 2002, Lee was seen by a physician's assistant, to whom he reported a decrease in energy over the last week, a likely side effect of the non-pegylated interferon treatment. <u>Id</u>.

On September 4, 2002, Lee was seen in the hepatitis C clinic by Dr. Ciaglia. <u>Id</u>. Dr. Ciaglia noted that Lee had completed the prescribed six-month course of hepatitis C treatment. <u>Id</u>. At that time Lee reported that he had no complaints, other than feeling "a little fatigue." <u>Id</u>. It was noted that Lee's viral load had been reduced to 260,000. <u>Id</u>.

In early September 2002, after the completion of Lee's six-month course of hepatitis C treatment, Dr. Edelman left his position at SCI-Mahanoy, and was no longer involved in Lee's medical treatment. (Doc. 89, Ex. H at ¶ 27.)

On October 3, 2002, Lee was retested for TB, which resulted in a positive diagnosis. (Doc. 89, Ex. D, Progress Notes.) At that time, Lee agreed to take "preventive therapy for TB infection." <u>Id</u>. It was determined that Lee would begin a nine-month

preventive therapy treatment.  Id.  Lee was then provided with handouts on Rifampin[5] and

TB infection, and the side effects of the treatment were explained to Lee.  Id.

Lee alleges that he sent request slips and complaints to Marva Cerullo, SCI-

Mahanoy Medical Department Administrator, and that even though she is "legally

responsible for the actions of the employees under her administration", all complaints

were ignored.  (Doc. 10, ¶ 10.)

Lee further alleges that while incarcerated in 1997, he tested positive for TB and

"instead of treating it in 1997, the medical department told him he was just fine or

intentionally botched up the test to avoid treating him."  Id.  He states that although "he

has tested positive for TB every year since 1997," and "complaints were filed to these

same people," they "decided to treat it after his whole liver had become inflamed from

the Hep-C virus."  Id.  However, "because of the toxic nature of the medicine, treatment

had to be stopped after five months, so he still has this disease also."  Id.

---

5.   If tests show – as Lee's did – a TB infection but not active TB, preventive drug therapy is
recommended to destroy dormant bacteria that might become active in the future.  Rifampin is one
of four medications used for such preventive treatment.  For treatment to be effective, the preventive
drug is usually taken for six to nine months.  See *Tuberculosis* at  http://www.mayoclinic.com/
health/tuberculosis/DS00372/DSECTION=8.

Thus, Lee filed the instant action in which he claims that Defendants "singularly, and in concert", conspired to deny Lee his right to adequate and complete medical care for his serious ailments, in violation of the Eighth Amendment.

## IV.   Discussion

### A.   Eighth Amendment Claims

The Eighth Amendment "requires prison officials to provide basic medical treatment to those whom it has incarcerated." Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999) (citing Estelle vs. Gamble, 429 U.S. 97 (1976)).  In order to establish a claim under § 1983 based on the Eighth Amendment, an inmate must show prison officials' deliberate indifference to a serious medical need. See Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004); Natale v. Camden County. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003).  In the context of medical care, the relevant inquiry is whether the defendant was: (1) deliberately indifferent (the subjective element) to (2) the plaintiff's serious medical needs (the objective element). Monmouth County Corr. Inst. Inmates vs. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987); West v. Keve, 571 F.2d 158, 161 (3d Cir. 1979).

The test for whether a prison official was deliberately indifferent is whether that defendant "acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 841 (1994).  Because only egregious acts or

omissions can violate this standard, mere medical malpractice can not result in an Eighth Amendment violation, nor can disagreements over a prison physician's medical judgment.  White v. Napoleon, 897 F.2d 103, 108-10 (3d Cir. 1990.)

Thus, a complaint that a physician or a medical department "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment..."  Estelle v. Gamble, 429 U.S. 97, 106, (1976).   "Allegations of medical malpractice are not sufficient to establish a Constitutional violation."  Spruill, 372 F.3d at 235.  "[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990.)   In sum, negligence, unsuccessful medical treatment, or medical malpractice do not give rise to a § 1983 cause of action, and an inmate's disagreement with medical treatment is insufficient to establish deliberate indifference.  See Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993.)

A mere difference of opinion between the prison's medical staff and the inmate regarding the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment.  Farmer v. Carlson, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988).  Additionally, if there is a dispute over the adequacy of the received treatment,

courts have consistently been reluctant to second guess the medical judgment of the attending physician. Little v. Lycoming County, 912 F. Supp. 809, 815 (M.D. Pa.), aff'd, 101 F.3d 691 (3d Cir. 1996.) The key question is whether the defendant has provided the plaintiff with some type of treatment, regardless of whether it is what the plaintiff desires. Farmer, 685 F. Supp. at 1339. Additionally, a non-physician defendant cannot be considered deliberately indifferent for failing to respond to an inmate's medical complaints when the inmate is already receiving treatment from the prison's medical staff. Durmer, 991 F.2d at 69.

The objective component of an Eighth Amendment claim, i.e., whether a plaintiff's medical needs were serious, has its roots in contemporary standards of decency. Hudson v. McMillian, 503 U.S. 1 (1992.) A medical need is serious if it is one that has been diagnosed by a physician as mandating treatment or is one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. Lanzaro, 834 F.2d at 347; West, 571 F.2d at 162-63 n.6. The serious medical need element contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain. See Lanzaro, 834 F.2d at 347. The record in this case establishes that Lee's hepatitis C is a serious medical need. Less clear is whether Lee's inactive and non-symptomatic TB and one-time complaint of sleep apnea can support an Eighth Amendment claim. However, we will assume for the sake of argument that these

conditions are objectively serious, since it is clear from the record that, serious or not, the defendants were not deliberately indifferent to these conditions.

A review of the documentation submitted by the defendants reveals that Lee was seen and treated extensively between July 5, 2001, the date of his arrival at SCI-Mahanoy and October 3, 2002, the date of the most recent medical record submitted.  During that period of time, Lee was received treatment on at least fifty occasions.  Lee's medical records show that he was prescribed medications for blood pressure, hepatitis C, tuberculosis and other general pain.  Lee also received numerous blood tests, x-rays, and evaluations.  (See Doc. 89, Ex. D, Progress Notes; Ex. E, Physician's Orders.)

Specifically, with respect to Lee's hepatitis C, the record shows that treatment was addressed within the first few weeks of Lee's arrival.  At that time, Lee was still considering his treatment options.  As of September 2001, Lee indicated his desire to await the arrival of the new pegylated interferon treatment.  However, the record reveals that in January 2002, Lee changed his mind and first voiced his preference for undergoing immediate non-pegylated interferon treatment, despite Dr. Edelman's medical opinion to contrary.  The requested non-pegylated treatment was then ordered for Lee and he completed a six-month treatment.  It is patently clear from the record that Lee's requests for medical treatment were not ignored by the prison medical staff or unreasonably

delayed.   Indeed,  the  record  indicates  substantial  and  meaningful  efforts  by  the

defendants to provide Lee with necessary and requested medical care.  The defendants

were anything but deliberately indifferent to Lee's hepatitis C.

Similarly the defendants provided appropriate care with respect to Lee's inactive

TB .  Although Lee tested positive in June, 2002, Lee was three months into his six

month course of treatment for hepatitis C and was not displaying any symptoms of active

TB.  (Doc. 89, Ex. D, Progress Notes.)  So as not to disrupt Lee's hepatitis C treatment,

it  was  decided,  without  any  noted  objection  from  Lee,  that  Lee  would  be  retested  in

October, 2002, at the end of his hepatitis C treatment.  Lee was then retested on October

3, 2002, and when he again tested positive for TB infection, but not active TB, a course

of preventive therapy began the same day.  No deliberate indifference can be found in the

defendants' treatment of Lee's TB.

Finally, Lee's alleges that he suffers from "serious breathing problems at night

during  sleep"  and  that  the  "medical  dept.  at  Coal  Twp  took  him  to  a  specialist  in

Pottsville  who  told  them  he  needed  an  operation",  however,  "they  still  refused  to  do

anything." (Doc. 20, ¶ 10B.)  Other than this allegation, the only reference in the record

to sleep apnea is a note that Lee underwent a sleep study while at SCI-Coal Township.

(Doc. 89, Ex. D, Progress Notes.)  There were no further instructions for any treatment

19

as a result of the study. <u>Id</u>. Nor is there any further complaint of sleep problems noted in Lee's medical record from July 5, 2001 through October 3, 2002. <u>Id</u>. Lee offers no other evidence of sleep apnea problems, the effect of such problems on his health, or requests for treatment. Thus, at most, Lee's allegations regarding his sleep apnea amount to disagreement in medical judgment between an unnamed "specialist in Pottsville" and prison medical staff. However, mere negligence in diagnosis or a difference in opinion regarding treatment is insufficient to state an Eighth Amendment claim.

In sum, Lee has failed to present evidence from which a reasonable jury could conclude that the defendants possessed the culpable mental state necessary for Eighth Amendment liability to attach. The Constitution prohibits states from inflicting cruel and unusual punishment on prisoners. The Constitution decidedly does not require states to make prisons comfortable, and a prison sentence is not a voucher for free health care on demand. The extent and quality of the timely medical care that the defendants provided Lee precludes a finding of deliberate indifference, and therefore, the defendants will be granted summary judgment.

**B.**   **Claims Against Defendant Cerullo**

The only allegations in Lee's amended complaint regarding Marva Cerullo, the administrator of the medical department at SCI-Mahanoy, is that "Lee has sent request slips to her along with complaints to medical staff" but that these requests "were ignored." (Doc. 20, ¶ 10.)  The evidence entirely contradicts this allegation.

The record before this Court contains two Inmate Requests to Staff Member addressed to Marva Cerullo.  (Doc. 33, Ex. 9, Ex. 14.)  The first request, dated July 23, 2001, seeks authority for treatment of an undisclosed "medical problem". (Doc. 33, Ex. 14.)  The response by Defendant Cerullo is dated July 26, 2001, and it advises Lee that "There is no medical treatment that I authorize.  I am not a doctor."  Id.  The second request, dated January 9, 2003, seeks to change Lee's current medications.  (Doc. 33, Ex. 9.)  Defendant Cerullo's response, dated January 13, 2002, once again advises Lee that "You're asking me questions I cannot answer, discuss these issues at chronic clinic please.  I am not a doctor, and, like you, I do what they tell me to do."  Id.   It is apparent from the record that Defendant Cerullo did not "ignore" Lee's complaints.  She simply provided responses that Lee did not like.  To the extent Lee has made out any claim based on Cerullo "ignoring" his requests, Cerullo is entitled to summary judgment.

Further, Cerullo cannot be found liable for any alleged Eighth Amendment violation because, as discussed above, Lee was receiving extensive treatment from prison medical staff, and Cerullo, a non-medical prison official, was entitled to rely on the medical staff's professional judgment in Lee's treatment. <u>See Spruill</u>, 372 F.3d at 236; <u>Durmer</u>, 991 F.2d at 69. Thus, Defendant Cerullo is entitled to judgment as a matter of law.

Finally, to the extent that Lee's claims against Cerullo are based on her alleged "responsib[ility] for the actions of the employees under her administration", Cerullo is entitled to summary judgment because § 1983 liability may not be based on a theory of respondeat superior. *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005); *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)

## V.   Conclusion

For the foregoing reasons, the defendants' motions for summary judgment will be granted. An appropriate order shall enter.[6]

---

6. Also pending is a motion (Doc. 102) by Dr. Edelman to strike the "reply" brief filed by Lee in opposition to Dr. Edelman's motion for summary judgment (Doc. 101). As Dr. Edelman notes, neither the Federal Rules of Civil Procedure nor this Court's Local Rules allow for a sur-reply brief without leave of court, which Lee was not granted. As Dr. Edelman also notes, however, Lee's second opposition brief is largely repetitive of his first. Given Lee's pro se status and the disposition of Dr. Edelman's motion to dismiss, the motion to strike will be denied.